CLERKS OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED
March 25, 2025
LAURA A. AUSTIN, CLERK
BY: s/D. AUDIA
        DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | |
|---|---|
| Casey Blake, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| Frederick County Fire and Rescue Dept. *et al*, | ) |
| | ) |
| Defendants. | ) |

Civil Action No. 5:24-cv-00068

## MEMORANDUM OPINION

This matter is before the court on motions to dismiss filed by each of the defendants
in this case: Defendant Frederick County (Dkt. 4), Defendant Frederick County Fire and
Rescue Department ("FCFRD" or the "Fire Department") (Dkt. 6), Defendant Steven
Majchrzak (Dkt. 8), and Defendant Michael Bollhoefer (Dkt. 10) (collectively "Defendants").
For the reasons that follow, the court will grant FCFRD's and Frederick County's motions to
dismiss, (Dkts. 4, 6), and will grant in part, and deny in part, Defendants' remaining motions
(Dkts. 8, 10).

## I.    Background

Facts alleged in the complaint are accepted as true for the purpose of resolving the
motions. *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). In August 2019,
Plaintiff Casey Blake was hired by FCFRD as an administrative assistant to then-Fire Chief
Dennis Linaburg. (Compl. ¶ 13 (Dkt. 1).) When Linaburg retired and Majchrzak took over
as Fire Chief, Blake became Majchrzak's assistant. (*Id.*) Blake has performed an administrative

assistant role which includes various administrative and executive support tasks.  (*Id.* ¶ 14.)
The support tasks include formulation of general policies and procedures for procurement as
well as preparation and presentation of the department budget.  (*Id.*)

In late 2021, Blake's son, Nicholas Blake ("Nick"), applied for a firefighter position
with FCFRD.[1]  (*Id.* ¶ 16.)  Nick began his training as a firefighter recruit on March 3, 2022.
(*Id.*)  On his first day, Nick experienced a medical emergency during physical training.  (*See id.*
¶¶ 18–26.)  The physical training began with a run around the Fire Department's Public Safety
Building.  (*Id.* ¶ 20.)  As they ran, Kyle Ritter, an instructor with FCFRD, called the recruits
derogatory and demeaning names, referring to several as "worthless" and stated he was going
to work them to death.  (*Id.*)  Several laps into the run, Nick fell behind the other recruits, and
Ritter screamed at him using derogatory and demeaning language.  (*Id.* ¶ 21.)  When Nick told
Ritter that he felt something was wrong, Ritter replied that he did not care and continued to
call Nick names.  (*Id.*)  At various points during the physical training, Nick collapsed, with
Ritter continuing to scream at him to keep running.  (*Id.* ¶ 22.)  At one point, Nick began
having difficulty breathing, seeing, and hearing.  (*Id.*)  After several minutes of Nick
experiencing a dangerously high heart rate, an ambulance was called.  (*Id.* ¶¶ 24, 26.)

The next day, on March 4, 2022, Blake informed Majchrzak about the training incident
and Nick's medical emergency.  (*Id.* ¶ 30.)  Majchrzak told Blake that he would investigate, but

---

[1] For clarity, while Plaintiff Casey Blake is referred to as "Blake," Nick Blake is referred to as "Nick."

after having a twenty-minute meeting the same day with Deputy Chief Keith Jenkins and Ritter, Majchrzak told Blake that Nick must have misunderstood the situation. (*Id.* ¶¶ 30–32.)

On July 5, 2023, an FCFRD recruit, Ian Strickler, died while undergoing physical training supervised by Ritter. (*Id.* ¶ 40.) Strickler's heart rate measured at over 200 beats-per-minute before he collapsed, and his body temperature was recorded at 104 degrees Fahrenheit. (*Id.* ¶ 41.)

Eventually, Blake began to believe that the Fire Department's primary concern was protecting itself from liability for Strickler's death. (*Id.* ¶ 44.) After being informed that an investigation was no longer being conducted by the assigned Virginia Occupational Safety and Health Program ("VOSH") investigator, Blake decided to write an anonymous letter to Strickler's family. (*Id.* ¶ 49.) The letter encouraged Strickler's family to investigate the details of Ian's death and hire a lawyer to do the same. (Compl. Ex. B.)[2] The letter also detailed individuals who may have information about Ian's death and practices of past Fire Department recruit classes. (*Id.*) Finally, the letter described Ritter's behavior as "egregious" and noted that Ritter "almost killed a recruit last March," in an apparent reference to Nick's medical emergency. (*Id.*) On July 14, 2023, Blake mailed the anonymous letter to Strickler's family, intending for it to reach the VOSH investigator. (Compl. ¶ 51.)

---

[2] The court may consider the letter along with other exhibits attached to the complaint in its resolution of the motions to dismiss. *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016).

During this time, no one within FCFRD knew that Blake had written and sent the anonymous letter to Strickler's family.  (*Id.* ¶ 53.)  On August 14, 2023, Blake saw a social media post from Strickler's mother, Alice Strickler, requesting that anyone with information about Strickler's death contact the VOSH investigator.  (*Id.* ¶¶ 50, 55.)  Blake directed Nick to email the VOSH investigator to ask if he had received the anonymous letter.  (*Id.* ¶ 56.)  The VOSH investigator replied that he had received the anonymous letter, and that he wished to meet to discuss the matter further.  (*Id.*)  Blake and Nick went to the VOSH office in Verona, Virginia to speak with the VOSH investigator and one of his colleagues.  (*Id.* ¶ 57.)  Blake told the VOSH investigator that she was the author of the anonymous letter.  (*Id.* ¶ 58.)  The VOSH investigator explained that prior to receiving the letter, he was going to close the investigation due to a lack of evidence.  (*Id.* ¶ 59.)  After receiving it, however, he stated that he would keep the investigation open and continue interviewing more people within FCFRD.  (*Id.*)  The VOSH investigator returned to question the same individuals he had previously interviewed, as well as to speak with new witnesses.  (*Id.* ¶ 60.)

On September 11, 2023, Alice Strickler met with County Administrator Bollhoefer and Majchrzak.  (*Id.* ¶ 61.)  Alice Strickler told them that she had received the anonymous letter and read them an excerpt.  (*Id.*)  Although Majchrzak and Bollhoefer were unaware of the existence of the letter until that meeting, Majchrzak told Bollhoefer that he believed Blake was the author of the letter.  (*Id.* ¶¶ 62–63.)  Bollhoefer and Majchrzak then began telling other

FCFRD employees and staff that Blake had written the anonymous letter. (*Id.* ¶ 65.) Blake was out on vacation from September 11 to 17 but returned to the office on September 18. (*Id.* ¶¶ 66, 68.)

After her return on September 18, 2023, Majchrzak refused to look at or speak with Blake. (*Id.* ¶ 69.) Majchrzak began managing his own calendar by removing everything Blake would add to it. (*Id.*) Blake was excluded from senior staff meetings despite it being part of her job responsibilities. (*Id.* ¶¶ 69–70.) Blake experienced people within the department gossiping about her as well as making loud comments within earshot of how ashamed she should feel. (*Id.* ¶ 71.) People then stopped interacting with Blake altogether. (*Id.* ¶ 72.)

On October 10, 2023, The Winchester Star featured an article about Strickler's death and how his family believed that FCFRD failed in preventing it. (*Id.* ¶ 73.) The article noted the anonymous letter Strickler's family received. (*Id.*) In a statement for the article, Bollhoefer said the following about the anonymous letter:

> We have been made aware of an anonymous letter but have not been provided with a copy. Based on information provided to us by the Star regarding that letter, we are aware of that letter making a specific allegation regarding training in March 2022. We find those allegations to have no factual basis and find them to be false and defamatory.

(*Id.* ¶ 74; Compl. Ex. D.)

On October 11, 2023, Blake attended a Frederick County Board of Supervisors meeting with Strickler's family. (Compl. ¶ 77.) At the meeting, Alice Strickler noted that a

FCFRD recruit had nearly died a year prior to Strickler's death, but the Fire Department had not done anything to prevent such a situation from repeating. (*Id.*) The following day, The Winchester Star released an article describing the events surrounding Strickler's death and the Board of Supervisors meeting. (*Id.* ¶ 78.) In his comment for the article, Bollhoefer said that the allegations related to Nick's medical emergency "ha[d] no factual basis." (*Id.* ¶ 79.)

Both Blake and Nick attended the next Board of Supervisors meeting on October 25, 2023. (*Id.* ¶ 81.) After Blake signed up for the citizen comment portion of the meeting, she stood outside the building waiting for the session to start. (*Id.* ¶ 82.) As she waited, the retired Fire Chief, Linaburg, walked out of the building and aggressively approached Blake, saying that she should be ashamed of herself for using the Stricklers and their tragedy as a vendetta for Nick failing out of the recruit school. (*Id.*) The tense exchange ended with Linaburg calling Blake a liar and saying that she should "watch [her] back." (*Id.*) That night, Nick spoke at the Board of Supervisors meeting about his March 2022 training exercise and medical emergency. (*Id.* ¶ 84.)

On October 27, 2023, The Winchester Star published a new article about Nick's statement regarding his experience in recruit school. (*Id.* ¶¶ 85–86.) Bollhoefer stated in response, as part of the article, that Nick had "mischaracterized the event." (*Id.* ¶ 86.) Bollhoefer also stated in the article that Frederick County would retain an independent investigator to look into the incident. (*Id.* ¶ 88.) No update has ever been provided regarding

the investigation, and no one has ever reached out to contact Nick or Blake about the medical emergency or training program.  (*Id.*)

Since the series of October articles, treatment of Blake in the workplace has grown worse.  (*Id.* ¶¶ 89–90.)  In November 2023, the Fire Department held its annual budget meeting, but Blake was not invited.  (*Id.* ¶ 91.)  If a question arose during that meeting requiring Blake's input, Majchrzak directed anyone with questions to step outside the meeting to ask Blake, without inviting her into the meeting.  (*Id.*)  On December 1, 2023, Blake emailed Majchrzak requesting to work from home because of the treatment she received.  (*Id.* ¶ 92.)  Majchrzak temporarily approved the request and also forwarded it to Bollhoefer and Human Resources Director Michael Marciano for final review.  (*Id.*)  Since December 11, 2023, Blake has been working from home.  (*Id.* ¶ 93.)  She has had to occasionally come in to check mail, retrieve paperwork, or gather signatures.  (*Id.*)  When she has come in, she still overhears negative comments and complaints made about her.  (*Id.*)  Blake now actively avoids going back into the office during work hours.  (*Id.* ¶ 94.)

Blake no longer likes to leave her home because she fears nasty stares or demeaning comments.  (*Id.* ¶ 96.)  As a result, Blake submitted a Notice of Claim on March 1, 2024, to Frederick County pursuant to Va. Code § 15.2-209.  (*Id.* ¶ 98.)  And on June 13, 2024, Blake submitted a Notice of Demand for monetary damages to Frederick County pursuant to Va. Code § 15.2-1243 *et seq.*  (*Id.* ¶ 99.)  Frederick County has not responded to either letter.  (*Id.*

¶ 100.)  The day after she filed the Notice of Demand, Blake began receiving a notification on her work computer that an administrator was monitoring her activities.  (*Id.*)

On September 18, 2024, Blake filed the instant complaint in the U.S. District Court for the Western District of Virginia.  (*See* Dkt. 1-1.)  Her complaint asserts five counts—three claims against all four Defendants and two claims against a subset of Defendants.

In Count I, Blake asserts a claim for a declaratory judgment against all Defendants. (Compl. ¶¶ 101–107.)  In detailing the claim, Blake discusses her various allegations related to First Amendment retaliation, in violation of 42 U.S.C § 1983.  (*Id.* ¶¶ 102–106.)

In Count II, Blake asserts a claim of First Amendment retaliation in violation of 42 U.S.C. §1983 against all Defendants.  (*Id.* ¶¶ 108–18.)  She alleges that she exercised her First Amendment right to free speech "when she wrote and submitted the then-anonymous letter to the Strickler family to assist in an ongoing VOSH investigation into Ian Strickler's death." (*Id.* ¶ 111.)  She further alleges that the exercise of her First Amendment right was "on a matter of public concern" and that Defendants retaliated against her as a result.  (*Id.* ¶¶ 112–13.)

In Count III, Blake asserts a violation of Virginia's Whistleblower Protection Act against all Defendants.  (*Id.* ¶¶ 119–24 (citing Va. Code. Ann. § 40.1-27.3).)  Blake alleges that she "wrote the anonymous letter and sent it to the Strickler family with the intention that it would be turned over to the VOSH investigator."  (*Id.* ¶ 122.)  And upon learning of Blake's authorship, Defendants "initiated a campaign of retaliation that adversely affected Plaintiff's

compensation, terms, conditions, location, and privileges of employment and her mental and physical health." (*Id.* ¶ 124.)

In Count IV, Blake raises an intentional infliction of emotional distress claim against Majchrzak and Bollhoefer. (*Id.* ¶¶ 125–131.) Blake alleges that on September 11, 2023, Majchrzak and Bollhoefer determined that Blake had written the letter, and that soon after, the entire Fire Department found out. (*Id.* ¶¶ 126–27.) The following week, Blake alleges she was met with "verbal abuse, ostracization, ridicule, and hostility" from her peers and supervisors after being identified as a liar and traitor. (*Id.* ¶ 128.) Blake claims that the hostile environment was perpetrated by Majchrzak and Bollhoefer, as they were the only two individuals who knew Blake wrote the anonymous letter. (*Id.* ¶¶ 129–30.)

In Count V, Blake raises a defamation claim against Bollhoefer for multiple statements made concerning the allegations in Blake's anonymous letter. (*Id.* ¶¶ 132–142.) First, Blake points to Bollhoefer's October 10, 2023 statement to The Winchester Star, where he categorically stated that the anonymous letter had "no factual basis and [that he found its allegation] to be false and defamatory." (*Id.* ¶ 136.) Second, when the allegations in the letter were summarized at a Board of Supervisors meeting on October 11, 2023, Bollhoefer stated that they had "no factual basis." (*Id.* ¶ 137.) Third, after Nick spoke about his experience and medical emergency at a Board of Supervisors meeting, Bollhoefer stated that Nick had "mischaracterized the event." (*Id.* ¶ 138.) Finally, Blake alleges generally that Bollhoefer made

a serious of materially false statements in The Star. (*Id.* ¶ 140.) Blake claims that these statements harmed her reputation, contributed to a hostile work environment, and impacted her health. (*Id.* ¶¶ 141–42.)

Blake requests a variety of relief. (*See id.* at 31.) For her declaratory relief claim, Blake requests a declaration "finding that the Defendants have willfully and wrongfully violated their statutory, constitutional, and legal obligations, and have deprived [her] of her rights, privileges, protections, and entitlements under law, as alleged herein." (*Id.*) For her First Amendment retaliation claim, Blake requests injunctive relief "preventing any further restriction upon [her] free speech and preventing retaliation against [her] for having exercised her right to free speech." (*Id.*) As compensatory damages, Blake requests $10,000,000. (*Id.*) Finally, Blake requests punitive damages, attorney's fees and costs, and other relief the court deems proper. (*Id.*)

## II.    Standard of Review

Motions to dismiss under Rule 12(b)(6) test the legal sufficiency of a complaint. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). They do not "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Bing v. Brivo Sys., LLC*, 959 F.3d 605, 616 (4th Cir. 2020) (quoting *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016)). To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead sufficient factual allegations "to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S.

662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*

In reviewing a motion to dismiss for failure to state a claim, "a court must consider the factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff."  *Bing*, 959 F.3d at 616.  Evaluation is generally limited to the complaint itself.  *See* Fed. R. Civ. P. 12(d).  However, a court may also examine documents attached to the complaint as exhibits or those explicitly incorporated into the complaint by reference.  Fed. R. Civ. P. 10(c); *see Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016).

## III.    Analysis

### A.    Claims Against FCFRD

Defendant FCFRD moves to dismiss all claims with prejudice for failure to state a claim under Rule 12(b)(6).  (Dkt. 6.)  Blake did not file a response in opposition.  FCFRD argues that, as a department of the municipal government of Frederick County, it is not an entity that is capable of being sued in its own name under Virginia law.  (Dkt. 7 at 4.)

Under Federal Rule of Civil Procedure 17, the "[c]apacity to sue or be sued is determined" for entities like FCFRD "by the law of the state where the court is located."  Fed. R. Civ. P. 17(b)(3).  As "an operating division of a governmental entity" in Virginia, FCFRD "cannot be sued unless the legislature has vested the operating division with the capacity to be

- 11 -

sued." *Harrison v. Prince William Cnty. Police Dep't*, 640 F. Supp. 2d 688, 711 (E.D. Va. 2009).

"This rule has been applied to a diverse range of municipal departments in Virginia." *3Thomas v. Petersburg Util. Lines Water Dep't*, No. 3:19-CV-00162-HEH, 2019 WL 6792764, at *2 (E.D. Va. Dec. 12, 2019) (collecting cases).

Further, a fire department is "a department of government" under Virginia law.  Va. Code Ann. § 27-6.1.  And as a "department of government," courts have previously concluded that fire departments are not proper parties. *Phillips v. Lynchburg Fire Dep't*, No. 6:16-CV-00063, 2017 WL 2424715, at *3 (W.D. Va. June 5, 2017) (dismissing the Fire Department as a party because it is not a legal entity that can be sued); *Misjuns v. Lynchburg Fire Dep't*, No. 6:21-CV-25, 2023 WL 3026727, at *6 n.7 (W.D. Va. Apr. 20, 2023) (dismissing claims against the Lynchburg Fire Department after "Plaintiff and Defendants . . . agreed that [it] lacks capacity to be sued" under Virginia law); *see also Smith v. Town of S. Hill*, 611 F. Supp. 3d 148, 167 (E.D. Va. 2020) (dismissing claims against the South Hill Police Department because "[n]o Virginia statute or regulation allows the South Hill Police Department to be sued separately from the Town of South Hill").  Thus, the court finds that FCFRD lacks capacity to be sued under its own name and will grant FCFRD's motion to dismiss (Dkt. 6) in full, dismissing all claims against it with prejudice, and dismissing FCFRD as a defendant in this matter.

### B.    *Monell* Claims Against Frederick County

As a local government entity, Frederick County cannot be vicariously liable under 42 U.S.C. § 1983 for the injuries caused solely by its employees, Majchrzak and Bollhoefer. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). Instead, Frederick County can only be sued directly under § 1983 for monetary, declaratory, or injunctive relief when "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Id.* at 690. To constitute a so-called "*Monell* claim," a local government's official policy, decision, or custom must have played a part in the alleged violation of federal law. *City of Okla. City v. Tuttle*, 471 U.S. 808, 817–18 (1985); *see also Starbuck v. Williamsburg James City Cnty. Sch. Bd.*, 28 F.4th 529, 532–33 (4th Cir. 2022) ("*Monell* permits suits against a municipality for a federal constitutional deprivation only when the municipality undertook the allegedly unconstitutional action pursuant to an 'official policy' or 'custom.'")

A policy or custom for which a local government may be held liable can arise in four ways:

1. through an express policy, such as a written ordinance or regulation;
2. through the decisions of a person with final policymaking authority;
3. through an omission, such as a failure to properly train officers, that manifests deliberate indifference to the rights of citizens; or
4. through a practice that is so persistent and widespread as to constitute a custom or usage with the force of law.

*Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (cleaned up).

- 13 -

Blake asserts *Monell* liability through the second avenue: alleging a policy or custom based on the decisions of a person with final policymaking authority. Blake claims that Bollhoefer, as a final decision-maker, "promulgated, authorized, acknowledged, assented to, assisted, or consciously disregarded any unconstitutional custom or policy suggested or enacted by Majchrzak to retaliate against" her. (Dkt. 13 at 11.) In other words, Blake alleges that the retaliatory acts Majchrzak were subsequently ratified by Bollhoefer. (*See id.*)

A single decision by a policymaker can give rise to municipal liability, but only when "the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." *Hunter v. Town of Mocksville, N.C.*, 897 F.3d 538, 554–55 (4th Cir. 2018) (quoting *Liverman v. City of Petersburg*, 844 F.3d 400, 413 (4th Cir. 2016)). However, discretion to make decisions is not, by itself, enough: "[P]olicymaking authority implies authority to set and implement general goals and programs of municipal government, as opposed to discretionary authority in purely operational aspects of government." *Spell v. McDaniel*, 824 F.2d 1380, 1386 (4th Cir. 1987) (cleaned up). For liability to attach, there must be "a deliberate choice to follow a course of action" as opposed to inaction by the "official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986).

"If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final." *City*

- 14 -

*of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988).  In order to show that a decision has been ratified, a plaintiff must demonstrate that the final policymaker was both aware of the subordinate's action at issue and that it "*affirmatively approved* both the act and its rationale." *Davison v. Loudon Cnty. Bd. of Supervisors*, No. 1:16-CV-932, 2016 WL 4801617, at *6 (E.D. Va. Sept. 14, 2016) (citing *Ashby v. Isle of Wight Cnty. Sch. Bd.*, 354 F. Supp. 2d 616, 627 (E.D. Va. 2004) (emphasis added)).

Blake has failed to plead sufficient factual allegations that Bollhoefer was both aware of Majchrzak's retaliation and that he "affirmatively approved" the retaliation and its rationale. Blake's sweeping allegation that after Majchrzak told Bollhoefer he suspected Blake was behind the anonymous letter, "any action taken against Ms. Blake thereafter was either ratified or expressly known by Defendant Bollhoefer," (Compl. ¶ 63), is conclusory at best.  Blake's most specific allegation, that Majchrzak forwarded Bollhoefer an email that included Blake's complaints about a hostile workplace, (*id.* ¶ 92), is also insufficient to allege that Bollhoefer ratified or affirmatively approved of the retaliation and its rationale.  That is because "mere acquiescence is not sufficient to demonstrate ratification."  *Davison*, 2016 WL 4801617, at *6 n.4; *see also Ashby*, 354 F. Supp. 2d at 627 ("[M]ere knowledge of the act is not enough.  There must be some approval of the act, not just refusal to overrule the act.").  Blake made no allegations that Bollhoefer issued any final decision affirming Majchrzak's purported retaliation.  At bottom, without alleging any affirmative approval, Blake's broad statements

- 15 -

that "Bollhoefer ha[s] encouraged and condoned this hostile work environment by failing to take any actions to stop the workplace harassment and retaliation," (Compl. ¶ 95), do not support liability.

Blake points to an additional theory of Frederick County's liability under *Monell*, arguing that the Board of Supervisors was "aware or complicit" in the unlawful retaliation because on March 1, 2024 and June 13, 2024, Blake sent a "Notice of Claim" and "Notice of Demand" to Frederick County, respectively. (Dkt. 13 at 12.) These actions, according to Blake, "plac[ed] [the Board] on notice of FCFRD's" actions. (*Id.*) Blake claims the Board never followed up with her, and instead began to actively monitor her computer activity. (*Id.*) Because they have done nothing to mitigate or prevent FCFRD's unlawful treatment, Blake asserts that the Board has "signifie[d] their ratification of Majchrzak and Bollhoefer's unlawful conduct toward her." (*Id.*) Similar to her claims against Bollhoefer, these claims against the Board do not allege that the Board affirmatively approved of any retaliation or its rationale. "[R]atification of a delegated act requires more than mere knowledge and acquiescence." *Scearce v. Pittsylvania Cnty. Bd. of Supervisors*, No. 4:23-CV-00012, 2023 WL 6121129, at *9 (W.D. Va. Sept. 19, 2023); *see also Ashby*, 354 F. Supp. 2d at 628 ("The common thread in [ratification liability] cases is that in addition to having knowledge of the subordinate's action, the final policymaker must somehow actively assist the subordinate or participate in administering the action as policy.").

- 16 -

Because she fails to allege affirmative approval by the Board, Blake's claims concerning the Board's ratification fail.

Even taking all of Blake's allegations as true and drawing all reasonable inferences in her favor, she has failed to plead facts that plausibly establish that her constitutional "deprivation occurred pursuant to a policy or custom adopted by the local governing body." *Scheffer v. Albemarle Cnty.*, No. 3:23-CV-00048, 2024 WL 2958952, at *3 (W.D. Va. June 12, 2024) (emphasis and citation omitted).  The court will dismiss Blake's *Monell* claim, asserting a § 1983 claim against Frederick County, without prejudice.[3]

### C.    Count I: Declaratory Judgment

In Count I, Blake asserts a claim for a declaratory judgment against Majchrzak and Bollhoefer.[4]  (Compl. ¶¶ 101–107.)  As relief, Blake requests the court enter a declaratory judgment finding that Defendants "willfully and wrongfully violated their statutory, constitutional, and legal obligations, and have deprived [Blake] of her rights, privileges, protections, and entitlements under law."  (*Id.* at 31.)

In just one paragraph of its memoranda, Defendants make two arguments as to why Blake has failed to state a declaratory judgment claim.  First, Defendants argue that Blake's

---

[3] Because Blake's claim under the Declaratory Judgment Act is premised on a violation of § 1983, (*see* Compl. ¶ 105), Frederick County is also dismissed from Count I.

[4] This claim is originally asserted against all Defendants.  As explained above, though, the court will dismiss FCFRD from the matter entirely and dismiss Counts I and II against Frederick County.  So, while Blake has sued all Defendants in Count I, this claim goes forward only against Bollhoefer and Majchrzak.

allegations "do not meet the standard for subject matter jurisdiction under the Declaratory Judgment Act" because she asks for a declaration "deeming past conduct illegal," which would be "merely advisory."  (Dkt. 5 at 5.)  Second, Defendants argue that even if the court has jurisdiction, it should exercise its inherent discretion to decline to hear the declaratory judgment claim.

1.    Blake's declaratory judgment claim does not ask for an impermissible advisory opinion.

Defendants argue that the court lacks subject matter jurisdiction over Blake's declaratory judgment claim because "deeming past conduct illegal" represents an impermissible advisory opinion.  (*Id.*)  The Declaratory Judgment Act empowers the Court to "declare the rights and other legal relations of any interested party" when there is "a case of actual controversy within its jurisdiction."  28 U.S.C. § 2201(a).  Defendants are correct that to secure a declaratory judgment, Blake must allege facts that "show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."  *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941).  Here, Blake's allegations describe a real and substantial injury: a hostile workplace and damage to her reputation.  In addition, Blake alleges that the controversy remains ongoing, as she claims that she continues to experience a hostile work environment, limited job responsibilities, and active monitoring by an administrator as she works from

home.[5]  (Compl. ¶¶ 92–93, 100.)  Blake's requested declaration would have a concrete remedial effect, as she continues to work from home in the same position.  Accepting Blake's allegations as true, the challenged retaliatory conduct by Defendants has not been rectified, thus is not past conduct, and a declaration regarding its constitutionality would not be advisory.  As a result, Defendants' argument on this issue fails.

          2.    <u>The court will not decline to hear the declaratory judgment claim.</u>

Defendants next argue that even if the court has jurisdiction over Blake's declaratory judgment claim, the court should decline to issue the declaratory judgment under these circumstances.  Defendants are correct that "[d]istrict courts possess discretion in determining whether and when to entertain an action under the Declaratory Judgment Act, even when the suit otherwise satisfies subject matter jurisdictional prerequisites."  *Metra Indus., Inc. v. Rivanna Water & Sewer Auth.*, No. 3:12-CV-00049, 2014 WL 652253, at *2 (W.D. Va. Feb. 19, 2014) (quoting *Wilton v. Seven Falls Co.*, 515 U.S. 277, 282 (1995)).  Under Fourth Circuit precedent, "a district court may decline to entertain a declaratory judgment claim when it has 'good reason' to do so."  *Variety Store, Inc. v. Martinsville Plaza, LLC*, No. 4:19-CV-00031, 2020 WL 1052525, at *3 (W.D. Va. Mar. 4, 2020) (quoting *Volvo Constr. Equip. N. Am., Inc. v. CLM Equip. Co.*, 386 F.3d 581, 594 (4th Cir. 2004)).  And the court has an obligation "to rule on the

---

[5] While Defendants attempt to "debat[e] whether the past acts of retaliation are still ongoing," (Dkt. 17 at 4), at this stage in the proceedings, the court accepts as true all of Blake's well-pleaded allegations and views the complaint in the light most favorable to her.  *Sec'y of State For Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007).  For the several reasons listed above, Blake has alleged that her workplace remains hostile.

merits of a declaratory action when declaratory relief would serve a useful purpose in clarifying and settling the legal relations in issue," and would "terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Id.* (citation and internal quotation marks omitted). Although Defendants ask the court to exercise its discretion, they provide no explanation as to what "good reason" the court might possess to exercise its discretion to not entertain this declaratory judgment action. As a result, Defendants' arguments fail and the court will deny Defendants' motions to dismiss Count I.

### D.    Count II: First Amendment Retaliation

In Count II, Blake asserts that Majchrzak and Bollhoefer retaliated against her for exercising her First Amendment rights, violating 42 U.S.C. § 1983.[6] (Compl. ¶¶ 108–18.)

#### 1.    Legal standard: First Amendment retaliation against public employees

At the outset, the parties disagree over the proper test for a First Amendment retaliation claim brought under § 1983. Blake relies on the Fourth Circuit's three-prong test from *McVey v. Stacy*, 157 F.3d 271 (4th Cir. 1998), in analyzing whether she, as a public employee, faced retaliation from her government employer. Defendants meanwhile rely on the Fourth Circuit's three-prong test from *Snoeyenbos v. Curtis*, 60 F.4th 723 (4th Cir. 2023), to evaluate Blake's claim. That test stems from the Fourth Circuit's seminal opinion in *Constantine*

---

[6] This claim is originally asserted against all Defendants. As explained above, though, the court will dismiss FCFRD from the matter entirely and dismiss Counts I and II against Frederick County. So, while Blake has sued all Defendants in Count II, this claim goes forward only against Bollhoefer and Majchrzak.

*v. Rectors & Visitors of George Mason University*, 411 F.3d 474 (4th Cir. 2005). While Defendants'
citations are instructive for First Amendment retaliation claims brought by private speakers,
here, Blake is a government employee. As a result, the three-prong test outlined by *McVey* is
more appropriate. *See Crouse v. Town of Moncks Corner*, 848 F.3d 576, 583 (4th Cir. 2017)
(utilizing the *McVey* framework "[w]hen a government employee claims that he was disciplined
because of his speech"); *see also Farrell v. Bd. of Educ. of Allegany Cnty.*, No. CV GLR-16-2262,
2017 WL 1078014, at *4 (D. Md. Mar. 21, 2017) (finding the framework from *McVey* rather
than *Constantine* appropriate when plaintiffs were former government employees).

2. Blake states a claim for First Amendment retaliation by alleging facts
sufficient to show retaliatory acts that are more than de minimis or
trivial.

While the parties disagree over the test to be applied, they agree that to state a claim
for First Amendment retaliation, Blake's alleged retaliatory acts must be more than de minimis
or trivial. (Dkt. 5 at 6; Dkt. 14 at 11.) The parties are correct. "As a threshold matter, an
employee must first establish that the employer took a sufficiently retaliatory action against
the employee." *Thomson v. Belton*, No. CV ELH-18-3116, 2018 WL 6173443, at *15 (D. Md.
Nov. 26, 2018). So, "courts have required that the nature of the retaliatory acts committed by
a public employer be more than de minimis or trivial." *Suarez Corp. Indus. v. McGraw*, 202 F.3d
676, 686 (4th Cir. 2000).

- 21 -

Defendants argue that Blake's complaint alleges retaliatory acts that are "primarily de minimis or trivial," because she did "not allege any effect on her hours of work, wages, or days worked" and because she alleges that Majchrzak granted her the opportunity to work from home. (Dkt. 5 at 6.) According to Defendants, that "is hardly the stuff of retaliation." (*Id.*) Blake responds by pointing to her allegations that Majchrzak limited Blake's job duties and responsibilities, prevented her from attending staff meetings, and turned her co-workers against her by facilitating a hostile work environment. (Dkt. 13 at 20–21.)

Blake has sufficiently alleged retaliatory acts that are more than de minimis or trivial. Blake alleged that Majchrzak purposefully excluded her from attending meetings by moving the meeting's physical location and avoided her. (Compl. ¶ 69.) And Majchrzak took steps to reduce Blake's job responsibilities by managing his own schedule. (*Id.*) Over time, Blake claims that she was deprived of many of her job duties. (*Id.* ¶ 70.) The court notes that some aspects of the complaint present a closer question as to whether certain acts are de minimis or trivial. For example, Blake alleged that people within the Fire Department whispered and gossiped behind her back. (*Id.* ¶ 71.) And Blake alleged that one employee would make loud comments disparaging her while at work. (*Id.*) Blake also alleged that after people stopped interacting with her, Majchrzak would stop by her office and insincerely ask her if everything was okay, "chuckl[ing] to himself as he left her alone again." (*Id.* ¶ 72.) However, at this stage of the litigation, Blake has alleged more than enough, even if some of her allegations may

appear closer to being de minimis.  After all, "[t]he cumulative impact of retaliatory acts may become actionable even though the actions would be de minimis if considered in isolation." *Brennan v. Norton*, 350 F.3d 399, 422 n.17 (3d Cir. 2003).  As a result, the court will deny Defendants' motions to dismiss Count II.

### E.    Count III:  Virginia's Whistleblower Protection Act

In Count III, Blake asserts that the Frederick County, Bollhoefer, and Majchrzak retaliated against her, violating Virginia's whistleblower protection law under Virginia Code § 40.1-27.3.[7]  (Compl. ¶¶ 119–24.)  Section 40.1-27.3 provides, in part, that:

> An employer shall not discharge, discipline, threaten, discriminate against, or penalize an employee, or take other retaliatory action regarding an employee's compensation, terms, conditions, location, or privileges of employment, because the employee:
>
> 1. Or a person acting on behalf of the employee in good faith reports a violation of any federal or state law or regulation to a supervisor or to any governmental body or law-enforcement official; . . . or
>
> 5. Provides information to or testifies before any governmental body or law-enforcement official conducting an investigation, hearing, or inquiry into any alleged violation by the employer of federal or state law or regulation.

Va. Code Ann. § 40.1-27.3(A).

To state a claim under the statute, Blake must allege facts sufficient to show that (1) she or someone acting on her behalf made a good faith report or provided information or

---

[7] This claim is originally asserted against all Defendants.  As explained above, though, the court will dismiss FCFRD from the matter entirely.  So, while Blake has sued all Defendants in Count III, this claim goes forward against Frederick County, Bollhoefer, and Majchrzak.

- 23 -

testimony of a federal or state law violation to a qualifying entity, (2) she was discriminated or

retaliated against by her employer, and (3) her report, information, or testimony was the 'but

for' cause of the discrimination or retaliation.  *See Workman v. LHC Grp., Inc.*, No. 1:23-CV-

048, 2024 WL 3572305, at *3 (W.D. Va. July 29, 2024); *Moore v. Copper River Shared Servs., LLC*,

No. CL-2023-9565, 2024 WL 366099, at *9 (Va. Cir. Ct. Jan. 30, 2024).  Defendants argue that

Blake is not a "whistleblower" because she did not make a report or give testimony to a

qualifying entity: "a supervisor or [] any governmental body or law-enforcement official" as

required by Va. Code Ann. § 40.1-27.3.  (Dkt. 5 at 7.)  They point out that Blake sent her

anonymous letter to the Strickler family with the intention that it would be turned over to the

VOSH investigator, and neither the Stricklers nor the VOSH investigator qualifies as a

reportable body.

Blake responds that she made a good faith report to two qualifying entities: first, her

"supervisor"—Majchrzak—and second, a "governmental body"—VOSH.  (Dkt. 13 at 24.)

Blake alleges in her complaint that after reporting her concerns to Majchrzak and witnessing

his inadequate investigation, she proceeded to elevate things by writing an anonymous letter

to Strickler's family with the intent they would share it with the VOSH investigator.  (*Id.* (citing

Compl. ¶¶ 30–34, 51).)

Blake's argument that she states a cause of action under the statute by meeting with her

"supervisor," Majchrzak, fails.  Blake does not allege that her March 4, 2022 meeting with

Majchrzak resulted in any discrimination or retaliation. (*See* Compl. ¶¶ 30–35.) Indeed, her complaint alleges that the "campaign of retaliation" only began after she sent the anonymous letter to the Strickler family "with the intention that it would be turned over to the VOSH investigator." (*Id.* ¶¶ 122, 124.) Thus, Blake has not alleged facts sufficient to show that any report to her supervisor resulted in discrimination or retaliation. Blake's argument that the anonymous letter sent to the Strickler family with the hope that it would be turned over to the VOSH investigator likewise fails. The statute requires that the "employee" or "a person acting on behalf of the employee" report to the qualifying entity. Blake's complaint has not alleged facts sufficient to show that either action occurred. First, Blake does not allege that she reported anything to the VOSH investigator.[8] Second, while Blake alleges that she wrote the letter "to the Strickler family with the intention that it would be turned over to the VOSH investigator," (*Id.* ¶ 122), that hope does not transform the Strickler family into someone "acting on behalf" of Blake. Further, nothing in the anonymous letter suggests on its face that the Strickler family should turn the letter over to VOSH. (*See* Dkt. 1-3.) Instead, Blake encouraged the Strickler family to investigate for themselves and hire an attorney to do the same. (*See id.*) Because Blake failed to allege facts sufficient to establish that she or her agent

---

[8] Defendants also claim that a VOSH investigator is not a qualifying reportable body, presumably because the investigator is not a "governmental body" or a "law-enforcement official." The court declines to address this argument as it is unnecessary for resolution of the motions.

made a good faith report to a qualifying entity, the court will dismiss Blake's claim under the Virginia Whistleblower Protection Act without prejudice.

### F.    Count IV: Intentional Infliction of Emotional Distress

In Count IV, Blake asserts a claim for intentional infliction of emotional distress ("IIED") against Majchrzak and Bollhoefer.  (Compl. ¶¶ 125–31.)  Blake alleges that a hostile work environment, created by Majchrzak and Bollhoefer, has damaged her "mental health and ha[s] caused her to fear for her safety when at the Fire Department and in the community-at-large."  (*Id.* ¶ 129.)

Under Virginia law, to state an IIED claim, a plaintiff must "allege that (1) 'the wrongdoer's conduct is intentional or reckless'; (2) 'the conduct is outrageous and intolerable'; (3) 'the alleged wrongful conduct and emotional distress are causally connected'; and (4) 'the distress is severe.'"  *Gilmore v. Jones*, 370 F. Supp. 3d 630, 680 (W.D. Va. 2019) (quoting *Russo v. White*, 400 S.E.2d 160, 162 (Va. 1991)).  "This is a high standard to meet."  *Fuller v. Carilion Clinic*, 382 F. Supp. 3d 475, 505 (W.D. Va. 2019).

Defendants contest only the second element of the claim, arguing that Blake has failed to state a claim for IIED because her allegations against them involve conduct that is not "outrageous and intolerable."  (*See* Dkt. 9 at 7–9; Dkt. 11 at 7–9.)

Whether conduct is sufficiently outrageous and intolerable is a question of law.  *Gaiters v. Lynn*, 831 F.2d 51, 53 (4th Cir. 1987).  "The determining factor is whether 'reasonable

persons could view the conduct alleged, if proved, as being so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Faulkner v. Dillon*, 92 F. Supp. 3d 493, 501 (W.D. Va. 2015) (quoting *Almy v. Grisham*, 639 S.E.2d 182, 187 (Va. 2007)) (internal quotation marks omitted). "Thus, liability does not extend to 'mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.'" *Daniczek v. Spencer*, 156 F. Supp. 3d 739, 760 (E.D. Va. 2016) (quoting *Gaiters*, 831 F.2d at 53).

Accepting Blake's allegations as true, she describes an increasingly hostile work environment, beginning on September 18, 2023. (Compl. ¶¶ 68–82, 89–97.) As to Majchrzak, he "refused to look at or speak to" Blake, "began managing his own calendar by removing everything [Blake] would add to his schedule," and excluded Blake from senior staff meetings. (*Id.* ¶ 69.) Additionally, Majchrzak entered Blake's office to "insincerely ask[] her if everything was okay and chuckle to himself as he left." (*Id.* ¶ 72.) Finally, when Majchrzak temporarily approved Blake's request to work from home, he "prevented her from taking home a printer thus ensuring that [she] would have to occasionally stop by the office and endure a hostile work environment." (*Id.* ¶ 92.)

As to Bollhoefer, beyond his statements in The Winchester Star, Blake does not point to specific conduct he committed against her. Blake does allege generally that Bollhoefer "framed her as a liar and a traitor," which caused hostility from others. (*Id.* ¶¶ 127–28.) And

- 27 -

Blake asserts that Bollhoefer "perpetrated" the hostile work environment because he had the "authority to stop the hostile treatment" against her, "but chose not to, and instead participated in it." (*Id.* ¶¶ 129, 131.)

The court finds that the alleged conduct from Majchrzak and Bollhoefer does not rise to the level of "outrageous and intolerable." Although unprofessional and indecorous, Defendants' alleged efforts to ostracize her at work, limit her job responsibilities, and exclude her from meetings do not meet the high bar Virginia law requires. Other "courts applying Virginia law have regularly recognized that it is especially difficult to establish IIED in the employment context." *See Ainsworth v. Loudon Cnty. Sch. Bd.*, 851 F. Supp. 2d 963, 982 (E.D. Va. 2012) (collecting cases); *see also McCoy v. Univ. of Va. Med. Ctr.*, No. 3:19-CV-50, 2021 WL 472930, at *8 (W.D. Va. Feb. 9, 2021) (finding that unprofessional, rude, and inappropriate statements in the workplace "do[] not rise to the high level required of an IIED claim"). While the conduct alleged on the part of Defendants was certainly problematic in the workplace, the court finds that it does not meet the exceedingly high threshold that Virginia courts have established for IIED claims. *See Sirleaf v. Doe*, No. 7:21-CV-00237, 2021 WL 3362033, at *2 (W.D. Va. Aug. 3, 2021) (explaining that "tortious, or even criminal, intent behind the actions is often insufficient to meet" the "extremely high threshold" of "outrageous and intolerable"); *McCoy*, 2021 WL 472930, at *8 ("Generally, verbal abuse and use of inappropriate language is not enough to satisfy the high burden to show outrageousness.").

- 28 -

Even considering the actions of non-defendants, the court concludes that none of the conduct alleged by Blake is so outrageous that it "go[es] beyond all possible bounds of decency" or is "utterly intolerable in a civilized community." *Almy*, 639 S.E.2d at 187. Blake alleges that she has been shunned from her workplace by her colleagues and that members of the community now identify her as a liar and a traitor. (Compl. ¶ 128.) But even assuming, as the court must, that Defendants' actions led to that conduct, it does not meet the high bar of outrageous conduct. *See Warner v. Buck Creek Nursery, Inc.*, 149 F. Supp. 2d 246, 265 (W.D. Va. 2001) (finding that defendants' false statements about plaintiff that were "made with the intent to destroy his reputation in the community" were not outrageous and intolerable); *Earley v. Marion*, 540 F. Supp. 2d 680, 690 (W.D. Va. 2008) (finding that rumors about a teacher's fitness to remain in the profession of teaching were not outrageous or intolerable), *aff'd*, 340 F. App'x 169 (4th Cir. 2009). The court will dismiss Blake's IIED claim without prejudice.

### G.    Count V: Defamation

In Count V, Blake asserts a defamation claim against Bollhoefer. (Compl. ¶¶ 132–42.) Blake's claim hinges on three statements made by Bollhoefer to The Winchester Star in October 2023.[9] (Compl. ¶¶ 74, 79, 86, 140.) Under Virginia law, to state a claim for

---

[9] In his October 10, 2023 statement to The Winchester Star, Bollhoefer said the following about the anonymous letter: "We have been made aware of an anonymous letter but have not been provided with a copy. Based on information provided to us by the Star regarding that letter, we are aware of that letter making a specific allegation regarding training

defamation, a plaintiff must "allege the '(1) publication of (2) an actionable statement with (3) the requisite intent.'"  *Stewart v. Evelyn*, No. 3:24CV84 (RCY), 2024 WL 4193899, at *8 (E.D. Va. Sept. 13, 2024) (quoting *Schaecher v. Bouffault*, 772 S.E.2d 589, 594 (Va. 2015)).

Bollhoefer contests only the second element, making two arguments as to why Blake has not sufficiently alleged "an actionable statement."  To constitute "an actionable statement," it "must be both false and defamatory."  *Jordan v. Kollman*, 612 S.E.2d 203, 206 (Va. 2005).  Relevant here, "statements of opinion are generally not actionable because such statements cannot be objectively characterized as true or false."  *Id.*  Additionally, to establish that a statement is actionable, a plaintiff must additionally allege that it was published "of or concerning" him.  *Gazette, Inc. v. Harris*, 325 S.E.2d 713, 738 (Va. 1985).

First, Bollhoefer claims that his statements are not actionable because they were "pure expressions of opinion and contain no provably false factual connotation."  (Dkt. 11 at 10.) Second, Bollhoefer argues that Blake has failed to allege actionable statements because they were not "of or concerning" her.

1.    The statements are not pure expressions of opinion.

---

in March 2022. We find those allegations to have no factual basis and find them to be false and defamatory."  (Compl. ¶ 74, *see* Compl. Ex. D.)

In his October 12, 2023 statement to The Winchester Star, Bollhoefer said that the allegations concerning Nick's medical emergency "have no factual basis."  (Compl. ¶ 79, *see* Compl. Ex. E.)

In his October 27, 2023 statement to The Winchester Star, Bollhoefer said that Nick's October 25, 2023 statements regarding his medical emergency "mischaracterized the event."  (Compl. ¶ 86, *see* Compl. Ex. F.)

Bollhoefer argues that his statements merely conveyed his opinion and are not provably false.  Blake disagrees.  Here, the court must determine whether each of Bollhoefer's statements in The Winchester Star are "capable of being proven either true or false" to be actionable.  *Olgiati v. Breitschmid*, 708 F. Supp. 3d 805, 810 (W.D. Va. 2023).

"'[P]ure expressions of opinion' are constitutionally protected and 'cannot form the basis of a defamation action.'"  *Tharpe v. Saunders*, 737 S.E.2d 890, 893 (Va. 2013) (quoting *Williams v. Garraghty*, 455 S.E.2d 209, 215 (Va. 1995)).  "Statements that are relative in nature and depend largely upon the speaker's viewpoint are expressions of opinion."  *Fuste v. Riverside Healthcare Ass'n, Inc.*, 575 S.E.2d 858, 861 (Va. 2003).  So, statements that "do[] not contain a provably false factual connotation" are generally considered "pure expression[s] of opinion."  *Tharpe*, 737 S.E.2d at 893.

Whether a statement is opinion or fact is determined by the court as a matter of law.  *Yeagle v. Collegiate Times,* 497 S.E.2d 136, 138 (Va. 1998).  When determining whether a statement is opinion, courts may look to "whether the challenged statement can be objectively characterized as true or false, the author or speaker's choice of words, the context of the challenged statement within the writing or speech as a whole, and the broader social context into which the statement fits."  *PBM Prods., LLC v. Mead Johnson Nutrition Co.*, 678 F. Supp. 2d 390, 401 (E.D. Va. 2009) (citing *Biospherics, Inc. v. Forbes, Inc.*, 151 F.3d 180, 183–84 (4th Cir. 1998)), *aff'd*, 639 F.3d 111 (4th Cir. 2011).

- 31 -

All three statements are capable of being objectively characterized as true or false. Evidence could be marshalled and presented to show the veracity of the allegations contained within the anonymous letter. *See Doe v. Shenandoah Univ.*, No. 5:21-CV-00073, 2022 WL 2525729, at *4 (W.D. Va. July 7, 2022).  In the October 10, 2023 statement, by saying that the allegations in the anonymous letter "have no factual basis" and are "false and defamatory," Bollhoefer is expressing that the anonymous letter lacks veracity.  (Compl. ¶ 74.)  Whether the allegations contained within the letter are true or not is something that is ultimately capable of being proven.  The same is true of Bollhoefer's statements about allegations related to Nick's medical emergency, that they (as described in the anonymous letter) "have no factual basis" and that Nick's description "mischaracterized the event."  (*Id.* ¶¶ 79, 86.)  Additionally, the context of all three of the statements, given as official responses to press inquiries, suggests that Bollhoefer was not putting forward a pure expression of opinion.  Bollhoefer's argument therefore fails.

### 2. The "of or concerning" requirement.

Under Virginia law, a plaintiff must allege that a defamatory statement was published "of or concerning" him to be actionable. *Gazette, Inc.*, 325 S.E.2d at 738.  However, a plaintiff "need not show that he was mentioned by name in the publication." *Id.*  "Instead, the plaintiff satisfies the 'of or concerning' test if he shows that the publication was intended to refer to him and would be so understood by persons reading it who knew him." *Id.*  So, even if not

- 32 -

named in the publication, a plaintiff can still assert a defamation claim if "there is such a description of or reference to him that those who hear or read reasonably understand the plaintiff to be the person intended." Restatement (Second) of Torts § 564 comment b (1977). "Extrinsic facts may make it clear that a statement refers to a particular individual although the language used appears to defame nobody." *Id.*

The first two statements that Bollhoefer made in The Winchester Star are "of or concerning" Blake. In his third, October 27, 2023 statement to The Winchester Star, however, Bollhoefer said that *Nick's statements* at the October 25, 2023 Board of Supervisors meeting "mischaracterized" his medical emergency. (Compl. ¶ 86, *see* Compl. Ex. F.) Bollhoefer's statement about Nick's characterization, then, was not intended to refer to Blake, and would not be understood by persons reading The Winchester Star to refer to her. The court will grant Bollhoefer's motion to dismiss as to the October 27, 2023 statements with prejudice.

The other two statements are both "of or concerning" Blake. Blake alleges that Bollhoefer and Majchrzak told "other FCFRD employees and staff that [Blake] had written an anonymous letter that was critical of the recruiting school." (Compl. ¶ 65.) Construing the allegation in the light most favorable to Blake, it is plausible that Bollhoefer's statements regarding the anonymous letter, as well as reference to Alice Strickler's speech that referenced the anonymous letter, were intended to refer back to Blake's allegations in the letter and the statement would be so understood by people reading it who were aware of who wrote the

- 33 -

letter. *See AvePoint, Inc. v. Power Tools, Inc.*, 981 F. Supp. 2d 496, 508 (W.D. Va. 2013) (finding that a statement referring to "Evil Avenue" plausibly was intended and would be understood as referring to "AvePoint" based on context). Blake has sufficiently alleged that there are "implications, inferences, or insinuations that *reasonably could be drawn* from each" of Bollhoefer's first two statements. *Handberg v. Goldberg*, 831 S.E.2d 700, 707 (Va. 2019). Therefore, the court will deny Bollhoefer's motion to dismiss as to the October 10, 2023 and October 12, 2023 statements.

### IV.    Conclusion

For the foregoing reasons, the court will **grant** Defendants Frederick County's and FCFRD's respective motions to dismiss (Dkts. 4, 6). All counts Frederick County will be **dismissed without prejudice**. All counts against FCFRD will be **dismissed with prejudice**, as the court concludes that Blake cannot correct the legal deficiencies in those claims via amendment.

The court will also **grant in part**, and **deny in part**, Majchrzak's motion to dismiss (Dkt. 8). The court will **grant** Majchrzak's motion to dismiss Counts III and IV and will **deny** Majchrzak's motion to dismiss Counts I and II. Counts III and IV against Majchrzak will be **dismissed without prejudice**.

Additionally, the court will **grant in part**, and **deny in part**, Bollhoefer's motion to dismiss (Dkt. 10). The court will **grant** Bollhoefer's motion to dismiss Counts III and IV and

will **deny** Bollhoefer's motion to dismiss Counts I and II. Counts III and IV against Bollhoefer will be **dismissed without prejudice**. Lastly, the court will **grant in part**, and **deny in part**, Bollhoefer's motion to dismiss Count V. Bollhoefer's motion will be **granted** as to the October 27, 2023 statement, but **denied** as to the other two statements. Count V, with respect to the October 27, 2023 statement against Bollhoefer will be **dismissed with prejudice**.

An appropriate Order will follow.

**ENTERED** this 25th day of March, 2025.

HON. JASMINE H. YOON
UNITED STATES DISTRICT JUDGE

- 35 -